IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 12-cv-01080-RBJ

D.R. HORTON, INC. – DENVER d/b/a TRIMARK COMMUNITIES, a Delaware corporation;
D.R. HORTON, INC., a Delaware corporation,

      Plaintiffs,

v.

MOUNTAIN STATES MUTUAL CASUALTY COMPANY, a New Mexico corporation;
ZURICH AMERICAN INSURANCE COMPANY, a New York corporation,
CONTINENTAL WESTERN INSURANCE COMPANY, an Iowa corporation,
HARTFORD CASUALTY INSURANCE COMPANY, an Indiana corporation; and
HARTFORD FIRE INSURANCE COMPANY, a Connecticut corporation,

      Defendants.

---

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

---

      This case between the plaintiffs and the one non-settling defendant, Mountain States Mutual Casualty Company, was tried to the Court on June 23–25, 2014. The issues remaining for trial after this Court's previous orders on various motions were whether Mountain States unreasonably delayed or denied payment of plaintiffs' costs of defending an underlying construction defect lawsuit, and if so, what penalty should be imposed under C.R.S. §§10-3-1115–16. The Court addresses those issues in this Order.

### FINDINGS OF FACT

      The Court finds that the following facts were either undisputed or were established to a preponderance of the evidence at trial.

1.      Plaintiff D.R. Horton, Inc.-Denver, d/b/a Trimark Communities, is a wholly-owned subsidiary of plaintiff D.R. Horton, Inc.  I will refer to the plaintiffs collectively in this Order as "Trimark."

2.      Between 2002 and 2008 Trimark was the developer and general contractor for the construction of a residential community in Arapahoe County, Colorado known as Windemere. Trimark did not perform any of the construction work itself.  Rather, it engaged approximately 28 subcontractors to perform that work.

3.      Each subcontractor was required to sign an "Independent Contractor Agreement" that included an agreement to defend and indemnify Trimark against claims arising from the subcontractor's work.  These contracts required the subcontractors to have Comprehensive General Liability ("CGL") insurance which also covered Trimark as an additional insured.  A representative example of these contracts is Ex. 2.[1]

4.      The CGL policies were written on standard printed forms generally in use in the insurance industry at the time.  During the trial the parties frequently referred to Ex. A-1, the Mountain States policy sold to A&A Construction for the period 2005–06, as an example of the standard form policies that were typically used, and I will refer to this policy for the same purpose in this Order.  To the extent the language of other policies might have differed somewhat, the Court has not observed any substantive difference.

5.      Ex. A-1 contains a provision (¶ II.5.a.) that states: "Any person or organization to whom or to which you are obligated by virtue of a written contract, agreement or permit to

---

[1] Trimark's exhibits are labeled Plaintiffs' Exhibits 1 through 68, and I will refer to them simply as Ex. 1, Ex. 2, etc.  Mountain States' exhibits are labeled Exhibits A-1 through A-124, and I will refer to them as Ex. A-1, A-2, etc.  The parties, particularly the defendant, brought voluminous documents to the trial in multiple large three-ring binders, and it was suggested at one point that this was for the record on appeal. However, only those documents that were offered into evidence and either admitted or rejected by the Court may be included in the appellate record.

provide such insurance as afforded by this policy is an insured, but only with respect to liability resulting from . . . your work."  This is the "additional insured" clause.  It is undisputed that Trimark is an additional insured under each of the CGL insurance policies sold by Mountain States to the subcontractors it insured.

6.      The CGL policies also provided: "We will have the right and duty to defend any 'suit' seeking those damages to which this insurance applies."  Ex. A-1, ¶ I.A.

7.      On June 4, 2008 the Windemere Townhome Association, Inc. (the "homeowners' association") served Trimark with a notice of claim of construction defects, which is a prerequisite for the filing of a construction defect action in Colorado per C.R.S. § 13-20-803.5 (a).  The notice asserted a wide variety of complaints including problems with roofs, windows, doors, tiles, drywall, kitchen cabinets, countertops, plumbing, electrical, insulation, cracking in floors and garage slabs, concrete, exterior cracking, drainage, decks, hardwood flooring, carpeting, heating, air conditioning, painting, sprinklers and landscaping.  Ex. 4.

8.      Trimark, through counsel, sent letters to its subcontractors tendering the defense of the claim and potential suit and requesting that the subcontractors notify their insurers and demand a defense and indemnification on behalf of both the subcontractor and Trimark.  *See, e.g.*, Ex. 5.

9.      Among the subcontractors or insurers who received these letters were:

(1)      Mike's Stucco, which was engaged in July 2002 to provide stucco and stone masonry.  Trimark tendered its defense to Mike's Stucco and its insurer, Continental Western Insurance Company, on or about June 6, 2008.

(2)        Concrete Express, which was engaged in November 2002 to provide concrete flatwork and other work.  Trimark tendered its defense to Concrete Express and its insurer, Zurich American Insurance Company, on or about March 11, 2008 (even before Trimark received the homeowners' association's formal statutory notice).

(3)        A&A Construction Services, which was engaged in April 2004 to provide exterior finish work.  Trimark tendered its defense to A&A Construction and its insurer, Mountain States, on or about June 9, 2008.

(4)        Horizon Drywall, which was engaged in March 2004 to install drywall. Trimark tendered its defense to Horizon Drywall and its insurer, Mountain States, on or about September 8, 2008.

(5)        Tri-Star Drywall which was engaged in May 2005 to install drywall. Trimark tendered its defense to Tri-Star Drywall and its insurers, Mountain States and The Hartford Fire Insurance Company, on or about March 23, 2010.

*See* Ex. A-33 at Bates #MSI003015.

10.     There is no dispute about the timeliness of Trimark's tenders of its defense to Mountain States under the various policies.

11.     Mountain States initially denied the tender of the defense.

12.     On January 5, 2009 Trimark proposed that the two insurers who had by that time acknowledged their duty to defend, Zurich and Continental Western, share the defense costs

equally.  Ex. 3 (first page misdated January 5, 2008).  Neither insurer accepted the proposal or paid defense costs in accordance with it.

13.     On February 19, 2009 the Colorado Court of Appeals issued its decision in *General Security Indemnity Co. v. Mountain States Mutual Casualty Co.*, 205 P.3d 529 (Colo. App. 2009).  The significance of this decision is discussed later in this Order.

14.     On September 1, 2009 the Windemere homeowners' association filed a construction defect lawsuit in the district court for the 18th Judicial District (Arapahoe District Court) naming Trimark, various individuals, and several subcontractors as defendants.  Ex. 9. The subcontractors named included Mike's Stucco, Concrete Express, and A&A Construction, among others.  It did not include Horizon Drywall or Tri-Star Drywall.  *Id.*

15.     Trimark filed a third party complaint against the subcontractors that had been named as defendants by the homeowners' association.  *Id.*

16.     On May 5, 2010 Trimark added Horizon Drywall, Tri-Star Drywall, and various other subcontractors not named as defendants by the homeowners' association as third-party defendants in an amended third-party complaint.  Ex. 10.

17.     In response to the Colorado Court of Appeals' ruling in *General Security*, the Colorado General Assembly enacted C.R.S. § 13-20-808.  The statute, effective as of May 21, 2010 and applicable to all pending and future actions, clarified the insurers' duty to defend in construction defect cases.  Included in this statute was the following provision: "An insurer shall defend a construction professional who has received a notice of claim made pursuant to section 13-20-803.5 regardless of whether another insurer may also owe the insured a duty to defend the notice of claim unless authorized by law."  *Id.* § 7(b)(1).

18.     By letter dated June 17, 2010, Stacey E. Scherer, Corporate Insurance Counsel for Mountain States, notified Trimark that it would provide a defense to Trimark under the policies Mountain States had sold to A&A Construction Services, subject to a reservation of the right to deny coverage and, if it were later determined that there was no coverage, a reservation of the right to terminate the defense and to seek reimbursement of defense costs paid.  Ex. 12.  Ms. Scherer qualified the agreement to defend by indicating that Mountain States would pay "the applicable portion" of Trimark's defense costs; that the applicable portion would be determined at the termination of the underlying claim by settlement or judgment; and it would be calculated either by the percentage of the underlying liability ultimately attributed to A&A Construction Services' work or by the relative limits of Mountain States' policies implicated by their "time-on-the-risk" in relation to other triggered liability policies.  *Id.* at 8.

19.     On June 22, 2010 Ms. Scherer notified Trimark of Mountain States' acceptance of Trimark's tender of its defense under the policies Mountain States had sold to Horizon Drywall, subject to the same reservation of rights and other limitations as had qualified its acceptance of Trimark's defense under the A&A Construction Services policies.  Ex. 13.

20.     On October 21, 2010, by agreement of the parties, the homeowners' association's lawsuit was re-filed as a complaint in arbitration before former judge Sandy Brook of the Judicial Arbiter Group in Denver, Colorado.

21.     On November 15, 2010 Ms. Scherer notified Trimark of Mountain States' acceptance of Trimark's tender of its defense under the policies Mountain States had sold to Tri-Star Drywall, again subject to the same reservation of rights and other limitations as had qualified its acceptance of Trimark's defense under the A&A Construction Services policies.  Ex. A-17.

22.     When the group of insurers that had accepted the tender of defense expanded from the original two (Continental Western and Zurich) to four (including Mountain States and Hartford), Trimark proposed a cost-sharing arrangement pursuant to a formula that was based primarily on the number of subcontractors each insurer insured but also took into consideration the dates the defense was tendered to them.  The formula did not take into consideration any assessment of a subcontractor's likely contribution to the alleged property damage.

23.     Trimark made this proposal without waving its position that the duty to defend is joint and several.

24.     Trimark (allegedly with the consent of the insurers) engaged a data management company, JDI Data Corporation, to handle the ministerial tasks of calculating each of the insurers' shares according to the formula and billing them accordingly.

25.     JDI's initial billing under the new proposed sharing arrangement, and therefore the first billing of any kind to Mountain States and Hartford, was dated April 8, 2011.  Ex. A-33 at Bates #MSI003006, 3010, and 3015.

26.     Because the formula was based largely on the number of subcontractors insured by the insurer, and because Mountain States was the only insurer with more than one insured subcontractor, it was allocated a larger share under Trimark's formula than the other three insurers.  Specifically, in the first invoice Mountain States' share of the then unpaid balance of $542,840 was $136,952 with respect to the A&A Construction policies (25.2%); plus $124,065 with respect to the Horizon policies (22.9%%); plus $31,772 with respect to the Tri-Star policies (5.9%) (because the Tri-Star allocation was divided between Mountain States and Hartford).  Thus, it was allocated 54% of the unpaid defense costs.  Ex. A-33 at Bates #MSI00315.

27.     Neither Mountain States nor any other insurer except Continental Western had paid anything towards defense costs to that date.  *Id.*

28.     On May 19, 2011 Ms. Scherer reiterated the restrictions it had imposed on Mountain States' acceptance of the defense.  Ex. 16.

29.     Trimark was not willing to agree to postponing reimbursement of its defense costs until the conclusion of the litigation, nor was it willing to agree that the amount of Mountain States' contribution would be based on either of the alternatives demanded by Ms. Scherer.

30.     Prior to Ms. Scherer's May 19, 2011 letter Trimark's third-party claims against Tri-Star Drywall and Horizon Drywall had apparently been settled for $68.37 and $1,034.58 respectively.  In the letter Ms. Scherer offered to settle Trimark's claims for defense costs attributed to the Tri-Star Drywall and Horizon Drywall policies based on a formula whereunder $68.37 and $1,034.58 would be divided by the total costs ultimately paid to the homeowners' association, and the result would then be multiplied by the defense costs incurred through the dates of those settlements.  However, in lieu of waiting until the end of the underlying case to be able to plug the numbers into her formula, she offered to settle Trimark's claims for defense costs under those policies for $500 and $2,500 respectively.  Alternatively, she requested copies of "all defense statements for analysis of which defense costs may be covered by the Mountain States policies."

31.     Trimark did not accept the offer nor did it, at that time, provide copies of the invoices of its lawyers in the underlying case.

32.     In two emails dated May 26, 2011, one concerning the A&A Construction Services policies and the other concerning the Horizon Drywall policies, Ms. Scherer advised

JDI that Mountain States would not make any payment towards defense costs until there was an agreement on the allocation of defense costs among the insurers.  Ex. 17 and Ex. 18.

33.     None of the four insurers ever accepted Trimark's proposed allocation formula, nor did they agree to an alternative allocation formula.

34.     Nevertheless JDI continued to submit monthly invoices to Mountain States and the other insurers based on the formula.  Ex. A-33 at Bates #MSI003006 through #DRIWM_JDI_000138.  None of the insurers paid the amounts billed to them, and with the exception of Continental Western, none of them made any payment at all through the September 6, 2011 billing.  By that time Trimark's total defense costs were $900,142.  Only $142,711 of that amount had been paid, all by Continental Western.  Mountain States' allocated (but unpaid) share of the unpaid balance by that time was $427,986.  Ex. A-33 at Bates #DRHWM_JDI_000061.

35.     On September 21, 2011 Mountain States sent Trimark a check for $10,000 under an A&A Construction policy.  When asked to explain this payment during her deposition, Ms. Scherer testified that she determined the amount, and that "It just seemed like a good-faith amount of a payment to make towards a disputed obligation of whether there was an allegation of property damage arising out of A&A's work.  It was just a contribution towards D.R. Horton's defense costs."  Ex. 33 at 246-47.[2]  She added that the amount was not based on any specific fact or policy provision.  When asked why she had decided to make a payment, she answered, "Because we were getting invoices from JDI, and I was making a payment towards a potential

---

[2] Designated portions of Ms. Scherer's video deposition were played but not recorded during the trial. Hard copies of the designated portions are contained in Ex. 33, and the admitted portions are highlighted. My references to Ms. Scherer's deposition are only to the admitted portions.  I note that the hard copy transcript includes objections to certain questions, but the objections were edited out of the video without any objections having been brought to the Court's attention.  Therefore, while I am aware that certain objections were made, I have not ruled on them and consider them to have been waived.

obligation." *Id.* at 247.  When asked why Mountain States decided to make a payment in September as opposed to April, she answered, "No reason." *Id.*

36.     On October 14, 2011, frustrated that its defense costs were not being paid, Trimark's counsel sent letters to the four insurers abandoning its proposed allocation formula and demanding that each insurer, either on its own or in conjunction with the other insurers, provide a complete (100%) defense.  *E.g.* Ex. 20 (copy of the letter sent to Ms. Scherer).  As of that date Trimark had incurred more than $1 million in defense costs and had paid nearly $900,000 of that amount itself.  *Id.*

37.     The letter to Ms. Scherer cited Colorado law and other authorities imposing a joint and several duty to defend on each insurer whose duty to defend is triggered and holding that disputes among insurers as to allocation may not be used to deny the insured a prompt and proper defense.  *Id.* at 2–3.  Similarly, the letter disputed Ms. Scherer's position that Mountain States' obligation to defend Trimark was proportional to its insureds' share of the liability to be determined in the underlying arbitration or on a contribution by limits basis.  *Id.* at 4-7.  Trimark indicated that if the insurers' failure to provide a defense continued, it would initiate insurance coverage litigation against them.  *Id.* at 8.

38.     Ms. Scherer acknowledged in her deposition that even after receiving Trimark's October 14, 2011 letter, Mountain States did not contact any of the other insurers to negotiate an allocation agreement or to ascertain whether an allocation agreement could be reached.  Ex. 33 at 269.

39.     By the time that JDI's November 22, 2011 invoice was issued, Mountain States' allocated share had grown to $558,470, of which only $10,000 had been paid.  Ex. A-33 at Bates #DRHWM_JDI_000097.

40.     On December 27, 2011 Mountain States paid another $25,000 to Trimark, again under an A&A Construction Services policy, bringing its total reimbursement of defense costs to that date to $35,000.  Ms. Scherer explained that "It was just a payment made in order to contribute to the potential duty to contribute."  Ex. 33 at 251.  Once again, it was not based upon any particular fact or policy provision but was "Probably in response to another JDI invoice."  *Id.* at 252.

41.     On approximately January 10, 2012 counsel for Mountain States requested copies of all invoices reflecting the work that was being billed as defense costs.  This is not the first time Mountain States requested invoices.  Ms. Scherer had first requested copies of these invoices in her letter of May 19, 2011.  Trimark had not sent copies of the invoices at that time and the matter apparently did not come up again until the January 2012 request.

42.     In response to this second request for invoices, Trimark's counsel indicated that before the invoices could be provided in "unredacted" form, Trimark needed assurance from Mountain States that the information in them would not be disclosed to Mountain States' named insureds, A&A Construction Services, Horizon Drywall, Tri-Star Drywall.

43.     To understand Trimark's position on the "unredacted invoices" issue, one needs to understand Trimark's defense strategy in the underlying litigation/arbitration.  Trimark's lead counsel in the underlying case, David McLain, testified that, on his advice, Trimark undertook to minimize its exposure in three ways: (1) defending against the claims of the homeowners' association; (2) attempting to transfer liability to the subcontractors who did the work through third-party claims; and (3) pursuing indemnification under applicable insurance policies.  The attempt to pass through liability to the subcontractors can be made by bringing third-party claims in the homeowners' suit or by waiting until after the suit is resolved and then suing the

subcontractors whose work was determined to have caused the property damage.  The second option is sometimes called "pay and chase."  Mr. McLain testified that pursuing third-party claims in the main litigation has the advantage of efficiency and avoiding a possible statute of limitations or statute of repose problem.  In this instance they chose to pursue the pass-through strategy by means of third-party claims in the main suit.  Mr. McLain indicated that the reason invoices were not provided the first time they were requested might have related to the concern that an adjuster or lawyer who was defending Trimark's third-party claims against Mountain States' named insureds might gain access to them (and thereby gain insight on Trimark's litigation strategy, I presume).

44.     Because Trimark considers its third-party claims to be a component of its defense strategy in the underlying case, it includes the costs incurred in prosecuting the third-party claims in the defense costs it expects Mountain States and the other insurers to pay.

45.     Mr. McLain also testified that, in his experience, insurance companies with a duty to defend do not object to the inclusion of the costs of pursuing third-party claims and, in fact, expect that such claims be pursued.

46.     Ms. Scherer testified at trial that she wanted unredacted invoices to be able to review and separate out the portion of the fees that were being charged to pursue affirmative claims (the third-party claims) and also to have documents supporting payment decisions in Mountain States' file.

47.     On February 5, 2012 Mountain States' counsel provided the requested assurance regarding the segregation of the invoices.  Unredacted invoices were provided to Mountain States on February 8, 2012.  Ex. A-35.

48.     The parties' insurance industry experts agreed that insurers should generally pay itemized invoices within 30 to 60 days after receiving itemized invoices.  Plaintiff's expert stated that he would regard a 90-day period as "generous" to the insurer.

49.     Despite Trimark's demand on October 14, 2011 that each insurer provide a complete defense rather than the allocated shares that Trimark had previously proposed, JDI continued to bill the insurers according to Trimark's original proposed allocation through its January 30, 2012 invoice.  That invoice indicated that the total defense costs were now $1,283,242, of which $239,639 had been paid ($204,639 by Continental Western, $35,000 by Mountain States).  Mountain States' share of the unpaid defense costs under the original proposed sharing formula at this time was now $584,536 out of $1,043,603, or 56% of the total balance.  This was comprised of $210,867 allocated to A&A Construction policies (20.2% of the unpaid balance); $232,981 allocated to the Horizon Drywall policies (22.3% of the unpaid balance); and $140,688 allocated to the Tri-Star Drywall policies (13.5% of the unpaid balance).  Ex. A-33 at Bates #DRHWM_JDI_000131.

50.     When payment of defense costs still was not forthcoming, Trimark filed the present coverage case against Mountain States and the other three insurers on March 8, 2012.

51.     JDI's first invoice after the suit was filed was its March 30, 2012 invoice.  This was the first invoice that did not allocate the defense costs based on Trimark's proposed allocation formula but instead on the basis that each insurer independently owed Trimark a complete defense.  Ex. A-33 at Bates #MSI001012.  Another change in this invoice is that, for the first time, it added a fifth insurer, St. Paul Travelers, which insured subcontractor Premier Paving.  *Id.*

52.     By that date Trimark's defense costs totaled $1,392,295.  Of that amount

$376,738 had been paid: $35,000 by Mountain States; $128,265 by Zurich; and $213,473 by

Continental Western.  That left $1,017,557 unpaid.  Mountain States was billed for the full

unpaid balance of $1,017,557 with respect to the A&A Construction Services policies.  It was

billed for the same $1,017,557 with respect to the Horizon Drywall policies.  It was billed for a

lesser amount with respect to the Tri-Star Drywall policies because Tri-Star was insured by both

Mountain States and Hartford.  Zurich, Continental Western, and St. Paul Travelers were also

billed (once each) $1,017,557.  *Id.*

53.     JDI's monthly billings thereafter similarly reflect Trimark's new position of

billing the entire unpaid defense costs to all insurers (again, with respect to the Tri-Star Drywall

policies, the amount was somewhat less).

54.     On July 17, 2012 Mountain States, through counsel, advised Trimark that it had

decided to pay an additional $197,584.90.  Ex. 23.  The rationale stated for that number was that

Mountain States had incurred $232,584.90 to date in defending its three named insureds, A&A

Construction Services, Horizon Drywall and Tri-Star Drywall, so it was paying the same amount

(less the $35,000 previously paid) to its additional insured, Trimark.  *Id.*

55.     In fact, Mountain States did not pay that amount.  Instead, it issued three checks

totaling $195,584.  The breakdown was $153,411.01 with respect to the A&A Construction

Services policies; $26,778.90 with respect to the Horizon Drywall policies; and $15,394.09 with

respect to the Tri-Star Drywall policies.  JDI credited these payments in its August 20, 2012

invoice.  Ex. A-33 at Bates #DRHWM_JDI_004203.

56.     This brought Mountain States' total contribution to Trimark's defense costs to

$230,584.  No additional payments have been made by Mountain States.

57.     In her deposition Ms. Scherer testified that the content of the unredacted invoices was not the basis of any coverage decision made by Mountain States.  Ex. 33 at 304.

58.     JDI's August 20, 2012 invoice added a sixth insurer, Chartis (now the American International Group, Inc. or "AIG"), which insured subcontractor Snow's Concrete.  This invoice billed the six insurers exactly the same amount as to each of their respective subcontractors without any adjustments based on tender dates or otherwise.  At this time the unpaid balance was $988,347.  Ex. A-33 at Bates #DRHWM_JDI_004189.  Mountain States was billed for that amount three times.  The other five insurers were billed that amount once each.

59.     JDI continued to bill the six insurers equal amounts thereafter, and the unpaid balance continued to decrease as additional payments were made (though not by Mountain States).  The final JDI invoice (so far as the record shows, at least) is dated July 30, 2013.  Ex. A-33 at Bates # DRHWM_JDI_005783.  This invoice billed each of the six insurers $64,108 as to each of their respective subcontractors.  *Id.*

60.     Although St. Paul Travelers and AIG were being billed by JDI, they were not added to the present coverage suit as additional defendants.

61.     Trimark claims that its total defense costs in the underlying action were $1,861,317.23.  *See* Ex. 39.  Of that amount, $1,456,891.29 was ultimately paid after the present coverage lawsuit was filed.  Ex. 42 at 2.

62.     Ms. Scherer testified in her deposition that Mountain States never said that the defense costs were unreasonable.  Mountain States did contend that not all of the defense costs related to defense of allegations of property damage arising from Mountain States' named insureds' work.  Ex. 33 at 290–91.

63.     Mountain States' counsel stated at trial that Mountain States was stipulating to the reasonableness of the defense costs in the sense that the hours recorded and the rates charged were reasonable.  Counsel indicated that this did not mean that Mountain States was stipulating that it was reasonable to include the costs incurred in the prosecution of the third-party claims in the defense costs.

64.     The arbitrator issued, among other orders, his "Final Award RE: D.R. Horton, Inc. – Denver Fees and Costs" on May 31, 2013.  Ex. A-29.  In that Order Trimark's fees and costs are listed at $1,320,175.69.  When asked about that figure Mr. McLain testified that it was the amount that the arbitrator determined that Trimark incurred in relation to the defense of the claims, not the prosecution of the third-party claims.  Mountain States' counsel followed up by suggesting that Judge Brook must have determined that $500,000 or $600,000 of Trimark's $1.8 million figure was for the prosecution of the third-party claims.  However, no evidence was presented by either party regarding the costs of pursuing the third party claims.  Absent other evidence, the Court infers that the amount probably was in the range of $540,000.

65.     While this case has been pending Trimark settled with Continental Western, Zurich, and Hartford.

66.     A summary chart prepared for trial by Mountain States indicates that the following contributions were made by the six insurance companies to Trimark's defense costs:

- Continental Western (Mike's Stucco):          $342,477.27

- Zurich (Concrete Express)                     $366,823.90

- Hartford (Tri-Star Drywall)                   $342,372.49

- Mountain States (A&A, Horizon, Tri-Star)      $230,584.00

- St. Paul Travelers Companies (Premier Paving) $250,441.95

16

- AIG Companies (Snow's Concrete)                    $259,275.36

    TOTAL:                                                  $1,791,974.97

Ex. A-116.

67.     Two subcontractors directly contributed to Trimark's defense costs: Campbell

Beard Roofing paid $32,237; and The Cooler Company, Inc. paid $42,820.  Ex. 41.  When those

amounts are added to the insurers' payments, Trimark received a total of $1,867,032.  This

number is slightly higher than Trimark's calculation of its total defense costs, $1,861,317.  The

court is unable to explain this small discrepancy.  However, the Court finds (and Trimark

acknowledges) that Trimark's defense costs were completely paid.

68.     Because its defense costs had been fully paid, Trimark dismissed (as moot) its

breach of contract claim against Mountain States.  This did not, however, moot the duty to

defend issue as to Mountain States, because Mountain States' contractual obligation to defend

Trimark is the key to Trimark's claim against Mountain States under C.R.S. §§ 10-3-1115 and

10-3-1116.

## PRIOR RULINGS IN THIS CASE

**Interpretation of C.R.S. §§ 10-3-1115 and 10-3-1116.**

Early in the case defendant Hartford filed a motion for a determination of law under Rule

56(a) as to whether plaintiffs were "first-party claimants" under C.R.S. §§ 10-3-1115 and -1116.

Section 10-3-1115(a) prohibits an insurer from unreasonably delaying or denying payment of a

claim for benefits that the insurer owes "to or on behalf of any first-party claimant."  Section 10-

3-1116(1) provides that a first-party claimant whose claim for payment of benefits has been

unreasonably delayed or denied may bring an action to recover "reasonable attorney fees and

court costs and two times the covered benefit."

Hartford argued, and I agree, that Colorado courts have historically viewed liability

insurance as "third-party" insurance, because it provides (subject to the policy's terms) a defense

and indemnification against claims against the insured brought by third parties.  However, the

statute defines "first-party claimant" to mean an individual or entity "asserting an entitlement to

benefits owed directly to or on behalf of an insured under an insurance policy."  C.R.S. § 10-3-

1115(1)(b)(I).  The Court concluded that Trimark is a "first-party claimant" under that definition

because the benefit Trimark is claiming – a defense, meaning payment of the attorney's fees and

other costs that Trimark incurs in defending against the underlying suit – is a benefit owed

directly to or on behalf of Trimark.  February 25, 2013 Order [ECF No. 87] at 2–5.

Reasonable minds can differ.  As I noted in that Order, two judges in this district and the

one state court trial judge whose analysis was brought to my attention agree with this

interpretation of the statute.  Two other judges in this district agree with the insurers'

interpretation.  There was no Colorado appellate law on the issue at the time, and to my

knowledge, there still is none.  I remain satisfied that the analysis expressed in the February 25,

2013 Order was correct.  The Court therefore denied Mountain States' motion to reconsider that

decision (and denied a request to certify the issue for interlocutory appeal).  Order of November

25, 2013 [ECF No. 178] at 7–8.

In the November 25, 2013 Order this Court also addressed Mountain States' motion for a

determination of law as to whether the provision of C.R.S. 10-3-1116(1) that permits the insured

to recover "two times the covered benefit" means that the insured receives two times the covered

benefit in addition to the covered benefit itself or two times the covered benefit inclusive of the

covered benefit.  Again, there was no controlling Colorado appellate law at that time.  This Court

interpreted the statute, as did Judge Babcock in *Rabin v. Fidelity National Property and Casualty*

*Ins. Co.,* 863 F. Supp. 2d 1107, 1111–12 (D. Colo. 2012), to mean that that the statute provides a

sanction or penalty of two times the covered benefit in addition to the covered benefit.  [ECF No.

178 at 11–13].  The issue has since been addressed by a panel of the Colorado Court of Appeals,

and its construction of the statute was the same as that of this Court.  *See Hansen v. American*

*Family Mutual Insurance Co.*, No. 11CA1430, 2013 WL 6673066, at *10–11 (Colo. App. Dec.

19, 2013).

In the November 25, 2013 Order the Court also discussed how the "covered benefit"

would be determined in this case.  The Court stated:

> Trimark proposed a cost-sharing arrangement under which its defense costs would
> be shared among the insurers.  The insurers, or at least the other insurers, agreed.[3]
> Trimark cannot reasonably expect Mountain States to have paid defense costs that
> Trimark allocated to and that were satisfied by others.  Therefore, the "covered
> benefit" applicable to Mountain States in this case is the portion of the defense
> costs not allocated to and paid by the other insurers.

> Trimark has indicated that, assuming the completion of its settlement with The
> Cooler Company, it no longer will press its contract claim for reimbursement of
> defense costs.  Therefore, Mountain States will not be required to complete its
> defense obligation to Trimark, although it conceivably could find itself in
> litigation with The Cooler Company or the other insurers.  *However, if the Court*
> *finds that Mountain States unreasonably delayed or denied the payment of its*
> *share of the defense costs, then Trimark will be entitled to recover a statutory*
> *penalty of two times the portion of its share that was unreasonably delayed or*
> *denied.*

> The following hypothetical example might help to clarify my application of this
> interpretation to the present case.  Suppose the total cost of defending Trimark
> was $1,000,000; Trimark allocated 80% of its defense costs to other insurers; and
> the other insurers paid their $800,000 share.  Mountain States paid $150,000, but
> $100,000 of that was unreasonably delayed.  The remaining $50,000 was
> unreasonably denied but was ultimately paid by The Cooler Company.  On those
> hypothetical facts, the Court would impose on Mountain States a statutory penalty
> of $300,000 – two times the sum of the portion of its obligation that was delayed
> ($100,000) or denied ($50,000).  There are other ways the statute could be
> interpreted, such as to assess a penalty of $400,000 in the example on the theory
> that timely payment of a portion of the covered benefit does not change the fact

---

[3] As indicated above in the Court's findings of fact, the insurers did not agree to Trimark's proposed
formula.  The Court's earlier misunderstanding was cleared up at trial.

that the covered benefit was not timely provided.  However, I conclude that my resolution is more consistent with the language of the statute and its apparent purpose.

[ECF No. 178 at 14–15] (emphasis added).

### **Joint and Several Duty to Defend.**

In a February 25, 2013 Order this Court addressed a motion for a determination of law filed by the plaintiffs, i.e., when multiple insurers have a duty to defend the same underlying case, is the duty joint and several?  My answer was "yes."  The insured is entitled to a defense – one defense.  There are ways of apportioning the cost of the defense among multiple insurers, but the insured does not have to go without a defense or fund its own defense while the insurers bicker about the proper apportionment.  The ultimate allocation of the defense costs among the multiple insurers must either be worked out among them or resolved by a court in litigation among them.  [ECF No. 87 at 5].

In the Order issued on November 25, 2013 the Court denied Mountain States' motion to reconsider the ruling that the duty to defend is joint and several.  [ECF No. 178 at 6].  The Court also denied Mountain States' motions for summary judgment under the Horizon Drywall and A&A Construction Services policies, reiterating that Mountain States' duty to defend Trimark had been triggered by the allegations in the underlying complaint as to those policies.  *Id.* at 8–10.[4]

---

[4] The issue of whether Mountain States also had a duty to defend Trimark under the Tri-Star Drywall policies was mooted by Trimark's decision not to continue to pursue its claim under those policies.  *Id.* at 9.

**CONCLUSIONS OF LAW**

**A.  <u>Duty to Defend</u>.**

To begin, I reiterate that Mountain States had a duty to defend Trimark against the

homeowner's association's suit.  Briefly, Section I of the policies includes the following standard

form coverage provisions:

    1.  Insuring Agreement

        a.  We will pay those sums that the insured becomes legally obligated to pay as
            damages because of "bodily injury" or "property damage" to which this
            insurance applies.  We will have the right and duty to defend any "suit"
            seeking those damages to which this insurance applies.
            . . .
        b.  This insurance applies to "bodily injury" and "property damage" only if:

            (1) The "bodily injury" or "property damage" is caused by an
                "occurrence" that takes place in the "coverage territory"; and
            (2) The "bodily injury" or "property damage" occurs during the policy
                period.

Ex. A-1 ¶ I.A.1.a.

Section V of the policy defines "occurrence" to mean "an accident, including continuous

or repeated exposure to substantially the same general harmful conditions" and "property

damage" to include, among other things, "[p]hysical injury to tangible property, including all

resulting loss of use of that property."  *Id.* ¶ V.11, 15(a).

Mountain States in its trial brief and again at trial has emphasized the case of *General*

*Security Indemnity Company of Arizona v. Mountain States Mutual Casualty Company*, 205 P.3d

529 (Colo. App. 2009).  Reflecting the small (and litigious) world in which we live, this was an

insurance coverage case that grew out of an underlying construction defect lawsuit by a

homeowners' association against D.R. Horton.  D.R. Horton incorporated the homeowners'

property damage allegations into a third-party complaint against its subcontractors, one of whom

was Foster Frames.  Foster Frames in turn filed a fourth-party complaint against its sub-subcontractors for indemnification in case Foster Frames turned out to be liable to D.R. Horton. Happily for Foster Frames, D.R. Horton's third-party claims were dismissed, thus apparently mooting Foster Frames' fourth-party claims.

Meanwhile, however, General Security, which had successfully defended its insured Foster Frames against D.R. Horton's third-party claims, sued the sub-subcontractors' insurance companies (one of which was Mountain States) seeking relief for their refusal to share in the costs of defending Foster Frames.  Problem was, the court held that "a claim for damages arising from poor workmanship, standing alone, does not allege an accident that constitutes a covered occurrence." *Id.* at 534.  This is not to say that there cannot be an "accident" or an "occurrence" in a construction defect case.  "[A] corollary to the majority rule is that an 'accident' and 'occurrence' are present when consequential property damage has been inflicted upon a third party as a result of the insured's activity." *Id.* at 535.  Still, Mountain States and the other insurers who declined to participate in Foster Frames' defense carried the day.

The victory was short-lived.  In response to *General Security* the Colorado General Assembly enacted C.R.S. § 13-20-808, effective May 21, 2010 and applicable to all "pending and future actions."  The statute provides, "In interpreting a liability insurance policy issued to a construction professional, a court shall presume that the work of a construction professional that results in property damage, including damage to the work itself or other work, is an accident unless the property damage is intended and expected by the insured."  C.R.S. § 13-20-808(3). And, significantly for purposes of the present case, section (7) of the statute describes insurers' duty to defend construction defect litigation:

(7)(a) An insurer's duty to defend a construction professional or other insured under a liability insurance policy issued to a construction professional shall be triggered by a potentially covered liability described in:

(I)     A notice of claim made pursuant to section 13-20-803.5; or

(II)    A complaint, cross-claim, counterclaim, or third-party claim filed in an action against the construction professional concerning a construction defect.

(b)(I)  *An insurer shall defend a construction professional who has received a notice of claim made pursuant to section 13-20-803.5 regardless of whether another insurer may also owe the insured a duty to defend the notice of claim* unless authorized by law.  In defending the claim, the insurer shall:

(A) Reasonably investigate the claim; and

(B) Reasonably cooperate with the insured in the notice of claims process.

C.R.S. § 13-20-808(7) (emphasis added).

The statute indicated that insurers are not required to cover damage to the insured's own work.  *See* C.R.S. § 13-20-808(3)(a).  This is consistent with certain exclusions in the standard form.  *See, e.g.,* Ex. A-1, exclusions j, k, l.  In short, the policy covers damage to property other than the insured's own property and work product.  But to the point before the Court in the present case, the statute made it abundantly clear that an insurers' duty to defend is triggered by a notice of defect under C.R.S. § 13-20-803.5, regardless of whether another insurer might also owe the insured a duty to defend.

As indicated above, this Court has previously held in this case that the duty to defend is joint and several.  The 2010 statute, C.R.S. § 13-20-808, is consistent with that holding.  The Tenth Circuit has held that the statute applies prospectively.  *Greystone Construction, Inc. v. National Fire & Marine Insurance Co.*, 661 F.3d 1272, 1279–81 (10th Cir. 2011).  Still, the statute was expressly intended to clarify and confirm "what has been and continues to be the policy of Colorado."  C.R.S. § 13-20-808(1)(b)(IV).  This Court holds that the statute did precisely that.

As relevant to the present case, the homeowners' association's statutory notice of claim of June 4, 2008 alleged a long list of alleged defects in the construction of the Windemere residential development, literally charts consuming seven pages.  Ex. 4.  The notice was addressed to Trimark, and it was in turn provided to Trimark's subcontractors who did the construction work.  These included the three subcontractors insured by Mountain States. Similarly, the homeowners' association's lawsuit, filed September 1, 2009, broadly asserted "construction defects and consequential damages," listing 82 categories of defects.  *See* Ex. 9 at ¶¶ 30–31.  The complaint expressly alleged that the defective construction resulted in "actual damage to real or personal property; actual loss of the use of real or personal property; and/or a risk of bodily injury or death to, or a threat to the life, health, or safety of, the occupants of the residential real property."  *Id.* at ¶ 36.

Trimark was named as a defendant in the underlying litigation.  A&A Construction Services and several other subcontractors were also named as defendants.  Mountain States' duty to defend Trimark under the A&A Construction policies arose upon the service of the statutory notice of claims of defects and continued to exist throughout the underlying lawsuit and arbitration.

It is less clear, as Mountain States has repeatedly argued, that its duty to defend was also triggered under the Horizon Drywall and Tri-Star Drywall policies.  They were not named in the homeowners' association's suit but were brought in by Trimark's third-party claims.  Regardless, Mountain States accepted the tender of the defense under the A&A Construction Services, and the Horizon Drywall, and the Tri-Star Drywall policies.

The fundamental flaw in Mountain States position during much of this case arose from its application of the additional insured clause in a way that limited its duty to defend.  The clause

states, "Any person or organization to whom or to which you are obligated by virtue of a written contract, agreement or permit to provide such insurance as afforded by this policy is an insured, but only with respect to liability resulting from . . . 'Your work' for that insured by you."  Ex. A-1, ¶ II.5.a.  Thus, for example, the A&A Construction Services policies insured Trimark for its "liability," if any, resulting from A&A Construction Services' work.  This limits Mountain States' potential <u>indemnification</u> obligation.  The extent of that obligation "typically cannot be determined until the resolution of the underlying claims."  *Cyprus Amax Minerals Co. v. Lexington Ins. Co.*, 74 P.3d 294, 301 (Colo. 2003).

In contrast, it is well settled in Colorado that the duty to defend is separate and distinct from the insurer's obligation to indemnify its insured.  *Hecla Mining Co. v. New Hampshire Ins. Co.*, 811 P.2d 1083, 1086 n.5 (Colo. 1991).  The duty to defend is broader than the duty to indemnify.  *Id.* at 1089.  "[A] duty to defend exists when a complaint includes any allegations that, 'if sustained would impose a liability covered by the policy.'"  *Cotter Corp. v. American Empire Surplus Lines Insurance Co.*, 90 P.3d 814, 827 (Colo. 2004) (quoting *Hecla*, 811 P.2d at 1089).  The insurer must defend if the underlying claim or complaint "alleges any facts or claims that might fall within the ambit of the policy."  *Cyprus Amax Minerals*, 74 P.3d at 301.

In her reservation of rights letters Ms. Scherer attempted to place significant limits on the scope of Mountain States' duty to defend.  She indicated that Mountain States' contribution to the defense costs would not be determined until the termination of the underlying case by settlement or judgment.  At that time Mountain States would either contribute in proportion to the percentage of the liability assigned to its named insured's work, or it would contribute according to the relative limits of its policies to other policies by time on the risk compared to the

total limits of all triggered policies.  These purported limitations fundamentally confuse the duty to indemnify with the duty to defend.

In the first place, insureds need not wait for a defense while the insurers squabble amongst themselves, indeed wait until after the case they are supposed to be defending has been concluded.  If the insurers can agree from the outset on a formula for allocating the defense costs among them, so much the better.  But the insured needs and deserves the defense while the underlying case is taking place.  As plaintiff's insurance industry expert put it, why should an insured with two insurers be in a less desirable position than an insured with one?

I do agree that the relative liability of each subcontractor, the respective policy limits of the triggered policies, and the insurers' time on the risk are factors that might be relevant to the ultimate allocation of the defense costs among the insurers.  *See, e.g.*, *Insurance Co. of North America v. Forty-Eight Insulations*, 633 F.2d 1212, 1225 (6th Cir. 1980).  *See also Public Service Co. v. Wallis*, 986 P.2d 924, 939–41 (Colo. 1999) (not addressing allocation of defense costs).  But those are matters to be resolved among the insurers, either by agreement or in a separate suit for contribution from carriers who paid less than a reasonable share.  The duty to defend the insured is joint and several and exists from the moment that a policy is triggered.  Even if an insurer believes that it can ultimately show that it had no obligation to defend, the appropriate course of action "is to provide a defense to the insured under a reservation of rights to seek reimbursement should the facts at trial prove that the incident resulting in liability was not covered by the policy, or to file a declaratory judgment action after the underlying case has been adjudicated."  *Hecla*, 811 P.2d at 1089.

It was evident to this Court during the trial that Mountain States considered its named insureds to be its "real" insureds, and that it considered its obligations to Trimark to be

something less.[5]  That simply is wrong under the insurance contract.  Mountain States could have chosen not to sell policies that included Trimark as an additional insured or to charge a premium commensurate with the risk that it would have to defend Trimark as well as its named insureds.  The latter might have forced Trimark to obtain its own liability insurance, as its subcontractors might not have been able or willing to purchase insurance at a higher price.  However, having sold the policies with the additional insured coverage, Mountain States took on the duty to defend the additional insured, whether or not it fully anticipated the potential consequences.

**The Covered Benefit**

Trimark's Position.

At trial Trimark indicated that it would limit its claim that its defense costs in the underlying case were unreasonably delayed or denied to the costs it incurred after it filed the present lawsuit on March 8, 2012.  These totaled $1,456,891.29.  Trimark therefore argues that the Court should impose a penalty of twice that amount, a little more than $2.9 million.  I do not agree.

In the first place, I note that Mountain States was never billed that amount.  JDI's first invoice after the present suit was filed was $1,017,557.  Ex. A-33 at Bates #MSI001012.  It

---

[5] For example, Ms. Scherer testified in her deposition that D.R. Horton did not pay a premium, that the policies were not underwritten for D.R. Horton, and that, "to the extent that D.R. Horton is asserting that it has the same rights under a policy that was issued to a named insured policyholder who went through that process and paid the premium, I think there is a substantial difference." Ex. 33 at 205.  She believes that Mountain States' obligation to Trimark is limited to liability arising from the named insured's work. *Id.* at 8.  As I have said, this might be true as to indemnity coverage, but it does not diminish Mountain States' joint and several duty to defend Trimark.  Mountain States did not respond to Trimark's October 11, 2011 letter demanding that it, either alone or in conjunction with other insurers, provide a complete defense.  *Id.* at 269.  Mountain States did not contact the other insurers to determine whether an allocation agreement could be reached.  *Id.*  Ms. Scherer explained that Mountain States was trying to determine what would be equitable for its policyholders, meaning its named insureds.  *Id.* at 271–72.  But Trimark, as an additional insured, was also a policyholder.

billed that amount to Mountain States under the A&A Construction Services polices and the Horizon Drywall policies.  It billed the same amount to Zurich (Concrete Express), Continental Western (Mike's Stucco) and St. Paul Travelers (Premier Paving), and a smaller amount to Mountain States and Hartford under the Tri-Star Drywall policies.  As time passed, payments were coming in, and a sixth insurer (AIG as the insurer of Snow's Concrete) was added.  As a result, the amounts billed to Mountain States and the others decreased.  In the last JDI invoice, dated July 30, 2013, it billed each of the six insurers $64,108.  It was a moving target, reflecting the fact that Trimark could only recover its defense costs once.  To assume for purposes of the statutory penalty that the full amount that was paid by all insurers and others after the date of the suit was the "covered benefit" that Mountain States should have paid, even though JDI never billed Mountain States for that amount, is unreasonable.

Moreover, Trimark ignores this Court's prior Order.  The Court held, "Trimark cannot reasonably expect Mountain States to have paid defense costs that Trimark allocated to and that were satisfied by others. . . . [I]f the Court finds that Mountain States unreasonably delayed or denied the payment of its share of the defense costs, then Trimark will be entitled to recover a statutory penalty of two times the portion of its share that was unreasonably delayed or denied."  November 25, 2013 Order [ECF No. 178] at 14–15.

The Court concludes that the "covered benefit" for purposes of application of the statutory penalty must be based upon what Mountain States can reasonably have been expected to pay.  Under the circumstances of this case, that means a reasonable share or contribution to the defense of the underlying case.

<u>Mountain States' Share</u>.

Neither party presented any analysis or numbers concerning an approach to the determination of the "covered benefit" other than their polar "all or nothing" positions. Despite the Court' questions about whether there was any other way to look at it, Trimark doggedly insisted that it was entitled to nothing less than two times $1,456,891. Mountain States equally stubbornly hung on to its position that it did nothing wrong and, if anything, overpaid. Therefore, because the Court concludes that neither of those positions is reasonable or appropriate, I turn to the task of determining the appropriate way to determine the "covered benefit" reasonably owed by Mountain States to Trimark under the facts of this case.

The share that Trimark's formula assigned to Mountain States was in the range of 54% to 56% of the defense costs. None of the insurers ever agreed to that formula, and Trimark eventually abandoned it. The Court finds that it would not be reasonable to use that formula to define Mountain States' reasonable share of the defense costs in any event. For one thing, Trimark later dropped its claim under the Tri-Star Drywall policies. Also, although this Court concluded that Tri-Star Drywall and Horizon Drywall had a duty to defend under Colorado law, the fact remains that the homeowners' association filed no claim against either of them; they were never held liable for any property damage; they were in the case only because of Trimark's third-party claims against them; and Trimark settled those claims for nuisance amounts (approximately $68 and $1,000) at about the same time that JDI sent its first invoice to Mountain States, well before the present suit was filed. Assigning them shares equal to Mike's Stucco, Concrete Express, A&A Construction Services, etc. on these facts was probably unreasonable when the formula was devised, and it would certainly be unreasonable on the facts as we now know them to be.

For many of the same reasons I do not find that it would be reasonable to use the percentage that Trimark's proposed formula allocated to A&A Construction Services. The fact that the two drywall companies were assigned equal shares under that formula mathematically makes the percentages assigned to A&A Construction Services (and the other insurers) suspect.

Nor am I persuaded that it would be reasonable to assign A&A a 25% share as one of the four insurers sued in this case. That would arbitrarily ignore the fact that six insurers were invoiced by JDI and collectively paid nearly all of the defense costs. To ignore two of them just because Trimark did not bring them into the coverage case makes little sense.

The facts could have developed differently. For example, Trimark could have demanded a complete defense from one insurer at the outset and left it to that insurer to seek contributions from others by negotiation or a contribution suit. But on the facts as they played out, the Court concludes that a one-sixth share, in recognition of the fact that six insurers were billed and collectively paid nearly all of the defense costs, is reasonable in this case.

Pursuit of Third-Party Claims.

Before applying that percentage to the total of the defense costs incurred after the present suit was filed, the Court must address one additional issue: whether the costs that Trimark incurred in pursuing third-party claims should be deducted. Mountain States argues that those costs are not reasonably part of its duty to defend Trimark. Under the circumstances here, I disagree.

I start with the language of the policy. The insurer has a "duty to defend any 'suit' seeking those damages to which this insurance applies." Ex. A-1, ¶ I.A. As indicated, Mountain States has a duty to defend Trimark against the homeowners' suit. A number of cases have held that the duty to defend includes paying for affirmative claims filed by the insured in some

circumstances.  For example, when the insured defendant files a counterclaim arising from the same facts as part of its defense strategy, several courts have held that the insurer must pay the costs of the counterclaim as well as the costs of directly refuting the plaintiff's claim.  *See Hartford Fire Ins. Co. v. Vita Craft Corp.*, 911 F. Supp. 2d 1164, 1183 (D. Kan. 2012) (holding that Hartford's duty to defend Vita Craft in the underlying case included the cost of Vita Craft's counterclaims that were inextricably intertwined and were part of the defensive strategy to reduce Vita Craft's liability); *Ultra Coachbuilders, Inc. v. Gen. Sec. Ins. Co.*, 229 F. Supp. 2d 284, 289 (S.D.N.Y. 2002) (holding that insurer must pay the costs of insured's counterclaims that were "'inextricably intertwined with the defense of [defendant's] claims and necessary to the defense of the litigation as a strategic matter'"); *Oscar W. Larson Co. v. United Capitol Ins. Co.*, 845 F. Supp. 458 (W.D. Mich. 1993), *aff'd*, 64 F. 3d 1010 (6th Cir. 1995) (where prosecuting counterclaims and cross claims is defensive and is reasonably necessary to limit or defeat the insured's liability, the costs are covered as defense costs); *cf. IBP, Inc. v Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 299 F. Supp. 2d 1024, 1031 (D.S.D. 2003) (defendant's cross claim against plaintiff in a separate lawsuit was "in essence IBP's answer to Tyson's complaint in Arkansas," and thus fell within the duty to defend).

The facts of the present case admittedly distinguish it from those cases.  Here we are dealing not with counterclaims against the plaintiff but with third-party claims against the subcontractors.  Mr. McLain testified that insurers are often willing to pay those costs, and it is not difficult to imagine at least one situation where that would make perfect sense.  Suppose, for example, Trimark had its own insurance.  Because Trimark's insurer in that hypothetical may well be liable to indemnify as well as to defend Trimark, it might be eager to fund an effort to

pass the indemnification burden through to the subcontractors by means of third-party contribution claims, at least where Trimark's insurer is not also the insurer for a subcontractor.

But that, too, is not this case. Here, under Trimark's theory, Mountain States (and the other insurers) would be paying the lawyers on both sides of the third-party claims. Trimark created the situation by insisting that the subcontractors provide the insurance rather than providing its own insurance. Neither the parties nor the Court found any case on point. The one case that tends to be the most supportive of Trimark's position is *Great West Casualty Co. v. Marathon Oil Co.*, 315 F. Supp. 2d 879 (N.D. Ill. 2003).[6]

Heidenreich Trucking Company picked up oil from Marathon Oil Company's terminals. The two companies had an agreement that Heidenreich would defend and indemnify Marathon for any claims arising out of the presence of Heidenreich's drivers at Marathon's terminals except for claims "arising solely out of [Marathon's] negligence." To meet that potential obligation Heidenreich had its insurer, Great West, name Marathon as an "additional insured" on its liability policy. The additional insured endorsement covered Marathon "only if [it is] liable for the conduct of [Heidenreich] and only to the extent of that liability."

A Heidenreich driver named Howe was killed when, upon arriving at a Marathon terminal and getting out of his truck to insert his access card in the card reader at Marathon's steel gate (and allegedly because Howe neglected to set the parking brake) the truck rolled forward, crushing him between the truck and the gate. Howe's estate sued Marathon, alleging that Marathon's negligence caused Howe's death. Marathon in turn filed a third-party claim for indemnification and contribution against Heidenreich. The court first held that Great West had a

---

[6] To understand the basic facts of the case it is helpful also to read an earlier decision in the same case, *Great West Casualty Co. v. Marathon Oil Co.*, No. 99C3101, 2001 WL 103426 (N.D. Ill. Jan. 31, 2001),

duty to defend Marathon against the estate's claims.[7]  Turning to Marathon's third-party claim, the court's research led it to conclude that the "general rule" seemed to be that "an insurer's duty with respect to affirmative claims brought by the insured depends upon whether such claims are 'defensive' in nature, meaning 'filed to limit a defendant's potential liability.'"  316 F. Supp. 2d at 881–82.  Noting that Marathon's third-party claim was intended to shift liability for the estate's claim from Marathon to Heidenreich, the court held that the costs of pursuing the third-party claim must be included in Great West's duty to defend the underlying case.  It explained,

> Great West . . . has come forward with not a single case that supports its argument that the duty to defend does not encompass fees and costs incurred in counterclaims or third-party claims aimed at shifting liability for the claim as to which the duty to defend exists.  "Defense" is about avoiding liability.  Claims and actions seeking third-party contribution and indemnification are a means of avoiding liability just as clearly as is contesting the claims alleged to give rise to liability.  A duty to defend would be nothing but a form of words if it did not encompass all litigation by the insured which could defeat its liability, including claims and actions for contribution and indemnification.

*Id.* at 882–83.

The court did not expressly discuss the conflict position that Great West was in, but it is similar to Mountain States' position here in the sense that Great West both had to defend Heidenreich against Marathon's third-party claims and pay Marathon's lawyers to prosecute those same claims.

I agree with the court's reasoning.  At the end of the day it seems to me that the simple answer is that if Mountain States owes Trimark a defense, and if Trimark's pursuit of third-party claims against the subcontractors was a reasonable defense strategy (which Mountain States has never disputed), then those costs are part of the defense costs.  Trimark's intent was to shift as much of its potential liability as possible to the subcontractors who did the allegedly defective

---

[7] Its reasoning is not germane to the present case but can be found in the January 31, 2001 Order, 2001 WL 103426, at *3–5.

work.  As in the *Great West* cases, Mountain States has not come forward with any case that supports its position to the contrary.[8]

I add that Mountain States knew, or surely should have known, that in the event of construction defect litigation, Trimark might seek indemnification or contribution from the subcontractors.  Mountain States could have deleted "additional insured" coverage from the policies or charged a higher premium.  Either option might have meant that Mountain States would not have gotten the business, but that is a function of the market.

Conclusion.

For the foregoing reasons, the Court concludes that the "covered benefit" for purposes of this case is one-sixth of $1,456,891, or $242,815.

**Unreasonable Denial or Delay**

The last issue is whether Mountain States unreasonably delayed or denied its obligation to provide the covered benefit.  With the exception of the $35,000 paid before this coverage suit was filed, the Court concludes that the clear answer is "yes."

As I have discussed, when the duty to defend is triggered under multiple policies issued by multiple insurers, each insurer has several options.  It may promptly negotiate a cost sharing arrangement with the other insurers.  It may defend but seek a contribution from the other insurers later, either by negotiation or litigation.  It may defend subject to a reservation of rights

---

[8] In a pre-trial motion in limine on the third-party claims issue, Mountain States cited *Allstate Ins. Co. v. Huizar*, 52 P.3d 816, 819–20 (Colo. 2002) in support of its position.  I disagree.  That case simply holds that an insured entitled to benefits under the uninsured benefits part of a no-fault auto policy is not entitled to an award of attorney's fees either (1) under the separate liability part of the policy or (2) under a new public policy exception to the American Rule.  Mountain States seizes on certain language in the opinion, namely, "the language of the insurance policy at issue here cannot reasonably be construed to obligate the insurer to defend the insured against a claim of the insurer itself, much less to pay the insured's legal expenses to challenge the validity of the provisions of the contract."  52 P.2d at 819.  The problem is, in the present case the duty to defend provision is not in a separate part of the insurance policy but is at the heart of the dispute.

to seek reimbursement if the facts developed in the underlying case show that there was no coverage.  It may defend but file a separate declaratory judgment action seeking a determination of its defense obligation.  But the one option the insurers do not have is to leave the insured to defend itself while they haggle among themselves as to what their respective obligations might be.

Here, however, that is precisely what happened.  Trimark was left to defend itself while Mountain States and the other insurers stalled, apparently hoping to minimize their respective contributions.  Mountain States neither defended in a timely manner nor based its reservation of rights on proper contingencies.

If one went back to the homeowners' original notice of claim, which triggered the duty to defend as a matter of law, Mountain States delayed making any payments for more than three years.  I do not find all of that delay to have been unreasonable.  For example, one cannot reasonably fault Mountain States for being uncertain as to its obligations in construction defect cases after the *General Security* case was decided.  That uncertainty was resolved by the Colorado General Assembly in May 2010, but even then one cannot blame Mountain States for not paying defense costs.  Trimark acknowledged at trial that it could not reasonably expect Mountain States to pay anything before it was invoiced, and the first invoice was not issued to Mountain States until April 8, 2011.

Mountain States still did not make any contribution to Trimark's defense costs for more than five months, and then only a very small fraction ($10,000) of what it was being billed.  Still, if one accepts the proposition that Mountain States could not be expected to contribute to defense costs until it received the "unredacted invoices" of the lawyers defending the underlying case, it

would follow that there could be no unreasonable delay before those invoices were provided and Mountain States had a reasonable time to evaluate them.

The "unredacted invoices" excuse, in the context of the facts here, was flimsy. To be sure, Trimark can be faulted for not providing the invoices or raising the segregated file issue and getting it resolved when Ms. Scherer first requested copies of the invoices in May 2011. But Mountain States did not make the request again. The burden of requesting information does not fall solely on the insurer. *See Glacier Construction Co. v. Travelers Property Casualty Co.*, No. 12-1503, 2014 WL 2782363, at *8 n.5 (10th Cir. June 20, 2014). Nevertheless, if having the underlying lawyers' invoices was critical to Mountain States' willingness to contribute to Trimark's defense costs, it could have followed up when they were not promptly provided.

In fact, Mountain States did make two payments, albeit small ones, before raising the issue again. More telling, even after receiving the unredacted invoices, Mountain States did not make a payment within the time period that both sides' experts testified was reasonable under industry standards. Further reflecting the seemingly pretextual nature of the unredacted invoices issue, when Mountain States eventually did make its third and final payment the amount had nothing to do with anything in the unredacted invoices. There was no attempt to separate out the costs for pursuit of third party claims. Indeed, Ms. Scherer admitted that the unredacted invoices did not affect Mountain States' coverage decision. Instead, the July 17, 2012 payment was based on the irrelevant amount that Mountain States had paid its own lawyers to defend its named insureds.

The matter is moot in the sense that Trimark is not claiming any unreasonable delay before it filed suit, which occurred one month after the unredacted invoices were provided. But even if the Court credits the lack of unredacted invoices as a reasonable excuse for Mountain

36

States' failure to make a more significant contribution to Trimark's defense costs, it concludes that a delay of five months after it received the unredacted invoices, including four months after the suit was filed, followed by a payment that made little sense and was unaffected by anything in the invoices, was unreasonable.  The unreasonable conduct did not end there.  The July 16, 2012 payment brought Mountain States' belated contribution to Trimark's defense costs to a total of $230,584.  Thereafter Mountain States dug in its heels and refused to pay a penny more, not only necessitating this coverage case against it but, as the record of this case will reflect, fighting on every front, giving no quarter, sometimes even seeming to disregard the Court's previous rulings.[9]

I hasten to acknowledge that Mountain States was not alone in unreasonably delaying the payment of defense costs.  However, the fact that other insurers belatedly stepped up to the plate did not excuse Mountain States from its own duty.  *See Signature Development Companies, Inc. v. Royal*, 230 F.3d 1215, 1220 (10th Cir. 2000) ("'[t]he fortuitous existence of another insurer who [wa]s willing to meet its own obligations' did not excuse [the defendant-insurer] from discharging its duty to defend.") (quoting *Aetna Cas. & Sur. Co. v. Coronet Ins. Co.*, 358 N.E. 2d 914, 917 (Ill. App. 1976)).

The Court has defined the "covered benefit" substantially to Mountain States' benefit, certainly much differently than has been proposed by Trimark.  Under the Court's conclusion that the covered benefit for penalty purposes is one-sixth of the defense costs incurred after the present suit was filed, Mountain States share of the defense costs is $242,815.  Coincidentally, the total amount Mountain States did pay, $230,584, was fairly close to that figure.  That does

---

[9] At trial Ms. Scherer implied that Mountain States participated in settlement discussions with other insurers while this case has been pending.  The details of any settlement negotiations are unknown to the Court.

not, however, foreclose the conclusion that the payments, in whole or in part, were unreasonably delayed or denied.

Because Trimark ascribes unreasonable delay only to payments made after it filed the present suit, the Court concludes that Mountain States' payments of $10,000 in September 2011 and $25,000 in December 2011 were not unreasonably delayed.  The Court finds that $195,584 of the $230,584 that was paid was unreasonably delayed.  The Court finds that the remaining $12,231 of Mountain States' reasonable share of the defense costs was unreasonably denied.  Therefore, the total portion of the covered benefit that was unreasonably delayed or denied is $207,815.

Accordingly, the Court imposes a statutory penalty pursuant to C.R.S. § 10-3-1116(1) of two times the covered benefit, that is, two times $207,815, or $415,630.  In addition, pursuant to the same statute, the Court awards Trimark its reasonable attorney's fees and court costs.  Because, under this statute, "[a]ttorney fees and costs are a component of damages and must be determined before a final judgment can be entered," *Hall v. American Standard Ins. Co. of Wisconsin*, 292 P.3d 1196, 1198, 1200-01 (Colo. App. 2012), the Court cannot yet enter its final judgment in this case.

**ORDER**

1. A final judgment will ultimately be entered in favor of the plaintiffs, D.R. Horton, Inc. – Denver d/b/a Trimark Communities, and D.R. Horton, Inc., and against defendant Mountain States Mutual Casualty Company and will include a statutory penalty in the amount of $415,630 plus reasonable attorney's fees and court costs.

2. The Court directs counsel for the parties to confer and to attempt in good faith to reach a stipulation as to the amounts of attorney's fees and costs.  If a stipulation is

not reached and filed with the Court within the time allowed by Fed. R. Civ. P. 54(d)(1) and (2) and D.C.COLO.LCivR 54.1, the parties may submit such papers as they deem appropriate and set the matter of the reasonable amounts of attorney's fees and costs for an evidentiary hearing.  The Court will determine fees and costs on the basis of what was reasonable and necessary to prosecute this case, excluding only those fees and costs that were specifically related to the claims against the co-defendants.

DATED this 22nd day of September, 2014.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge